UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER PAYNE,

    Plaintiff,

v.

                              Case No. 1:24-cv-814

WESTERN MICHIGAN UNIVERSITY,         Hon. Hala Y. Jarbou

    Defendant.
_____/

## OPINION

Amber Payne was fired from her job as a custodial employee at Western Michigan University (WMU) within five months of being hired. The university told Payne that it was letting her go because of her poor performance. In response, Payne filed this lawsuit, accusing WMU of discriminating against her because she was pregnant. Now the parties have filed cross-motions for summary judgment.[1] For the reasons set out below, the Court will deny Payne's motion and grant WMU's.

### I.    BACKGROUND

Amber Payne was offered a job in Western Michigan University's custodial department in March 2023. (Offer Letter, ECF No. 25-3, PageID.197.) She began working as a probationary employee on April 3, 2023. (Work Records, ECF No. 27-10.) She learned that she was pregnant that week. (Payne Dep. 36, ECF No. 25-2.) Payne's top-level supervisor was Juanita Snell, who supervised training in the custodial department. (Graham Aff. ¶ 3, ECF No. 25-12.) Snell was herself overseen by Nick Schmidt, who was the custodial department's director during Payne's

---

[1] Payne is only seeking partial summary judgment, as she does not seek judgment on both of her remaining claims.

employment. (*Id.* ¶ 3.) Ultimate authority over employment decisions rests with the human resources department; the person who fired Payne was Kurt Graham, WMU's director of labor relations. (*Id.* ¶¶ 1–2.)

Payne began having problems soon after starting at WMU. Snell testified that Payne was not thorough and took poorly to instruction; Snell noted one instance when Payne "got smart" with a supervisor who told her to clean something again. (Snell Dep. 69–70, ECF No. 25-4.) A supervisor to whom Payne was assigned shortly after starting, Robin McPherson, testified that she had to coach Payne on proper vacuuming technique not long after Snell had instructed Payne on the matter. (McPherson Dep. 45, ECF No. 25-6.) Karisa Miller, who supervised Payne following McPherson, testified that she had to ask Payne to redo incomplete work. (Miller Dep. 35–36, ECF No. 25-5.) At Payne's thirty-day evaluation, Snell graded Payne's performance as "satisfactory" in four respects and "unsatisfactory" in three. The quality of Payne's work, her acceptance of instructions and regulations, and her attendance were all deemed unsatisfactory. (First Evaluation, ECF No. 25-10, PageID.270.) When Payne had her sixty-day evaluation in June, Snell concluded that Payne's performance had improved. (Second Evaluation, ECF No. 25-13.) Payne was marked as "satisfactory" in all respects other than attendance. (*Id.*)

According to Snell, Payne's "work ethic" began to decline again after her sixty-day evaluation. Snell reported "getting a lot of complaints from various people on campus" about Payne's "disappearing" during the day. (Snell Dep. 102.) Matters came to a head shortly before Payne's final probationary evaluation. On August 17, custodial supervisor Louis Arnett found Payne laying down on a couch in a dark room with her eyes closed. (Arnett Dep. 76.) Payne testified that she was sitting up when Arnett came into the room and had not been sleeping. (Payne Dep. 75.) According to Arnett, he had to call out to Payne to get her to respond. (Arnett Dep. 76.)

When he asked what she was doing, she said she was taking a little rest (*id.*) and that there was nothing to do, which he regarded as a "horrible" response (*id.* at 105). Arnett told Payne it "wasn't cool" for her to be resting while not on break; he reminded her that there was always work to be done and directed her to do upkeep cleaning, such as washing doorframes and polishing water fountains. (*Id.*; Snell Firing Email, ECF No. 25-16, PageID.309.) Payne testified that she took a break because she felt very dizzy and overheated, but she admitted that she did not tell Arnett that she was unwell. (Payne Dep. 79.) Payne could not remember telling Arnett that she had nothing to do, but she acknowledged that he instructed her to clean the water fountains and doorframes. (*Id.*)

Arnett regarded it as "very important" to inform Snell and the other supervisors of this incident with Payne and convey his belief that Payne should fail probation. (Arnett Dep. 60–61.) He sent an email on August 21 with the details of this interaction, and his opinion that Payne should not pass probation, to Schmidt and the other supervisors. (Snell Firing Email, PageID.308.) He followed up the next day with yet more evidence of Payne's unsuitability, including complaints from coworkers that Payne did not help them clean and that they did not want to work with her in the future. (Arnett Email, ECF No. 25-17.) Others who worked with Payne agreed that she had failed her probationary period; Miller testified to a "consensus" among custodial supervisors about the inadequacy of Payne's performance. (Miller Dep. 44.) Schmidt testified that "all of the supervisors and custodians" who worked with Payne thought her frequently being on her phone "was a problem." (Schmidt Dep. 55, ECF No. 25-9.) He also said that he and the custodial supervisors were united in the belief that Payne should not pass probation. (*Id.* at 94.) Snell passed the supervisors' consensus on to the university's HR department. (*Id.* at 69.) Schmidt also emailed Amy Moran, an HR representative, with the supervisors' point of view. (Schmidt Email, ECF No. 25-19, PageID.315.) He pointed out that Snell had attempted to terminate Payne early

3

in her probationary period because of her attendance issues but that HR had counseled in favor of allowing her to continue. Schmidt said that because Payne had shown little improvement HR should now sanction her firing. (*Id.*)

According to Payne, the attendance issues noted in her first two evaluations were caused by her pregnancy; her absences in April and May were excused by doctors' notes (Payne Dep. 45, 48, 89), but Payne acknowledged that she left work early and arrived late on more than one occasion without presenting a doctor's note (*id.* at 89). Payne also admitted that she never asked for accommodations. (*Id.* at 85–86.) Payne did not tell her supervisors that she was pregnant (*id.* at 49–50), but Snell learned of her situation before her first evaluation. At that evaluation, according to Payne, Snell remarked that "it was inconvenient and terrible timing for [Payne] to be pregnant." (Payne Dep. 53.) Payne testified that Snell brought the issue up again at her second evaluation, with Snell telling her not to treat her pregnancy as a disability and asking her how she planned on managing her symptoms better. (*Id.* at 65.) Snell denied making either remark. (Snell Dep. 65–66.) Nor did Payne report either remark; she testified that her mother, also a WMU custodial employee, as well as a union representative named Kathy, advised her not to mention Snell's remarks to HR. (Payne Dep. 55, 66.)

Director of labor relations Kurt Graham (Schmidt Dep. 77) approved Payne's firing after speaking about Payne's performance with Schmidt and Snell. (Graham Aff. ¶¶ 13–14.) On August 23, Snell, Arnett, and another HR manager conducted Payne's final evaluation. (Snell Dep. 106.) Snell concluded that Payne's performance was unsatisfactory in multiple respects. (Final Evaluation, ECF No. 25-18.) Snell testified that her reasons for reaching that conclusion included Payne's frequent absences and partial days, as well as her sitting down during work hours. (Snell Dep. 106) Arnett's report about Payne's nap and her haphazard cleaning factored into

4

Snell's assessment. (Arnett Dep. 82–83.) Based on Arnett's feedback, as well as her own observations of Payne's shortcomings, Snell determined that Payne had failed her probation. (Snell Dep. 105–6.) Payne was then handed a termination letter. (Termination Letter, ECF No. 25-20.)

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission in July 2024 (Compl. ¶ 39), Payne initiated this civil action. Before the Court are Payne's and WMU's cross-motions for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant does not bear the burden of persuasion at trial, the necessary showing can be made by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting), or by "pointing out" that there is no evidence supporting such an element, *id.* at 325 (majority opinion). The nonmovant must then present "'sufficient evidence from which a jury could reasonably find' in its favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (quoting *Troutman v. Louisville Metro. Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)). When the movant does "bear[] the ultimate burden of persuasion" at trial, "a substantially higher hurdle must be surpassed," *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001); the case for the movant must be "such that every reasonable juror" would rule in their favor, *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *see Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488–89 (6th Cir. 2024).

These requirements apply independently when parties file cross-motions for summary judgment: just as the Court may find "that one party sufficiently demonstrated that no genuine

5

issue of material fact existed," it may also find that "neither party met its burden . . . when all inferences were drawn, in turn, for the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

### III.    ANALYSIS

#### A.    Title VII Claim

Title VII claims based on circumstantial evidence are evaluated according to the rebuttable presumption set out in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–3 (1973). *See McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024). The plaintiff must first establish a prima facie case of employment discrimination. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572–73 (6th Cir. 2006). A plaintiff who complains she was discriminated against because she was pregnant must show that she was (1) "pregnant," (2) "qualified for her job," and (3) "subjected to an adverse employment action," and also (4) that "there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

If the plaintiff establishes a prima facie case, "a presumption of discrimination arises, and the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was demoted for a legitimate, nondiscriminatory reason." *DeBoer v. Musashi Auto Parts*, 124 F. App'x 387, 391–92 (6th Cir. 2005) (cleaned up). If the defendant produces this evidence, the presumption "drops out of the picture," and the finder of fact must answer the "ultimate question" of whether the plaintiff was discriminated against. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). For the plaintiff to survive summary judgment, she must point to a factual dispute over whether "the employer's proffered reason was . . . the real reason for its action" and whether "the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *Hicks*, 509 U.S. at 515).

6

Payne argues her claim should not be evaluated using the *McDonnell Douglas* framework because she presents direct rather than circumstantial evidence of discrimination. (Pl.'s MSJ 16–17, ECF No. 16–17; Pl.'s Resp. 14, ECF No. 27.) This argument relies on Payne's blurring the difference between Snell—the only person who criticized Payne for taking excused absences for her pregnancy complications (*see* Payne Dep. 89)—and those who decided on Payne's continued employment. Snell indisputably did not have the final say over whether to terminate Payne; that power lay with the university's HR department and labor director Kurt Graham.

The most that can be said is that Snell "recommended" that Payne be fired (Pl.'s MSJ 17). But that does not prove that Payne's attendance motivated Snell's recommendation, let alone that Graham adopted that reason when accepting Snell's recommendation. Payne does not cite a single precedent binding on this Court that would permit characterizing Snell's comments as direct evidence that Graham acted with a discriminatory motive. (*See* Pl.'s MSJ 13.) This case is unlike those in which comments by a biased subordinate were considered direct evidence because a decision-maker relied solely on information supplied by the subordinate in assessing an employee's performance. *See, e.g.*, *Sharp v. Aker Plant Servs. Grp.*, 726 F.3d 789, 797–98 (6th Cir. 2013); *cf. Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 485–86 (6th Cir. 2013) (discriminatory comments by executives reinforce biased character of comments by lower-level decision-maker). WMU's HR department declined to fire Payne based on her excused absences when Snell first brought them up in May (*see* Schmidt Email, PageID.315), and Graham himself disclaimed reliance on them in explaining his decision (Graham Aff. ¶ 5). Graham also affirmed that his decision was based on information derived from sources other than Snell, including emails about Payne's performance and the concerns raised by Payne's direct supervisors and coworkers. (*Id.* ¶ 7.) There is simply no evidence, other than innuendo on Payne's part, that Payne's

7

attendance record influenced Graham's decision to fire Payne. Because Payne can point only to circumstantial evidence that her termination was caused by her pregnancy, her claim is appropriately assessed using *McDonnell Douglas*'s burden-shifting framework.

1. **Prima Facie Case**

It is undisputed that Payne was pregnant, that her firing was an adverse employment action, and that she was qualified for her job. WMU argues that Payne nonetheless cannot establish a prima facie case because she cannot show that her firing was connected to her pregnancy. (*See* Def.'s MSJ 16.)

Payne relies on Snell's critical comments about her pregnancy to establish a nexus between her firing and her pregnancy. Payne testified that Snell told her that her pregnancy was "inconvenient" and its timing "terrible" at her thirty-day evaluation. (Payne Dep. 52.) She also testified that Snell warned her not to treat her pregnancy as a disability and to "figure out" how to alleviate her symptoms at her sixty-day evaluation. (Payne Dep. 65.) Payne also points to the email Snell sent to HR recommending termination, in which Snell again referred to Payne's frequent absences and her leaving work early as examples of Payne's poor performance. (Snell Firing Email, PageID.308.) The final probation evaluation conducted by Snell which resulted in Payne's firing also discusses her "poor attendance" as "unsatisfactory." (Final Evaluation, PageID.313.) Snell, as the person in charge of training new hires, undoubtedly influenced the university's decision to terminate Payne's employment. (*See* Schmidt Dep. 69, 78; Miller Dep. 41; Graham Aff. ¶ 13–15.) Payne takes this evidence to suggest her pregnancy had some connection to her firing.

The plausibility of this connection is undermined by the delay between when Payne's pregnancy became known to the relevant decision-maker and her termination. While "[t]emporal proximity can . . . satisfy the nexus requirement in the pregnancy discrimination context," *Asmo v.*

8

*Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006), additional evidence is needed when "the timeline is less probative," *Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 582 (6th Cir. 2017); *see Patterson v. Spriggs Constr.*, No. 2:24-cv-2, 2025 WL 2025160, at *6 (M.D. Tenn. July 18, 2025) (collecting cases). In *Kubik*, for instance, the court held that a gap of five months between the end of the plaintiff's pregnancy and her termination could not on its own establish a connection between the two.

Here, the temporal gap between pregnancy and termination is just shy of probativeness. WMU's HR department learned of Payne's pregnancy no later than May 30, when Snell pointed to Payne's absences during her first few weeks of employment as a reason for finding Payne to have failed probation. (Snell Probation Email, ECF No. 25-11.) Snell noted that HR manager Amy Moran had "look[ed] into" the doctors' notes Payne supplied to excuse those absences "due to Am[b]er being pregnant." (*Id.*) Graham affirmed that he discussed Snell's email with Moran and decided to allow Payne to complete her probationary period. This evidence permits the inference—one Payne does not argue against—that Graham knew Payne was pregnant by the end of May. Yet Payne was not fired until August 23, almost three months later. The Court is unaware of a precedent in this circuit in which a span of three months created a genuine dispute over whether there was a nexus between pregnancy and termination. *Cf., e.g., Asmo*, 471 F.3d at 594 (two months); *Megivern v. Glacier Hills Inc.*, 519 F. App'x 385 (6th Cir. 2013) (same). To make out a prima facie case, then, Payne must come forward with evidence that WMU acted from discriminatory motives beyond temporal proximity.

*Kubik* teaches that biased comments or being treated worse than similarly situated workers can bolster the connection between pregnancy and adverse action. *See* 717 F. App'x at 582. Payne fails to marshal evidence of either. First, the only facts suggesting anyone at WMU was biased

9

against Payne were Snell's comments criticizing her attendance and telling her to manage her pregnancy symptoms better. But as was pointed out in evaluating whether Snell's comments were direct evidence of discrimination, only the statements of a decision-maker, or someone with decisive influence on the decision-maker, can establish that an employee was treated adversely out of animus. Nothing in the record even hints at Graham's being biased against pregnant workers, and Snell's recommendation did not determine Graham's decision. Payne cannot rely on Snell's biased comments to make out her prima facie case.

Payne also fails to show that she was treated differently than similarly situated custodial employees. Payne disclaims the obligation to make that showing, so she has arguably conceded the issue (Pl.'s Resp. 14–15).[2] But the record reveals no example of a worker with Payne's shortcomings passing their probationary period.[3] If anything, the evidence points in the opposite direction: Payne appears to have been given *greater* leeway because of her pregnancy. Her spotty attendance was not held against her, unlike another employee whom Snell recommended failing because she used sick leave during her first week of work. (Snell Probation Email.) Two of Payne's supervisors, one of whom was Snell herself, testified that they worked as custodial employees during their pregnancies and took maternity leave without suffering adverse consequences. (McPherson Dep. 52–53; Snell Dep. 63.) Payne's own sister, who works for the

---

[2] *See Agrawal v. Montemagno*, 574 F. App'x 570, 577 (6th Cir. 2014).

[3] A Title VII plaintiff typically must show that they were similarly situated in all material respects to employees who were treated differently to state a prima facie case. Under *Ensley-Gaines v. Runyon*, however, plaintiffs complaining of pregnancy discrimination need only show that they were comparable to another employee "in her or his ability or inability to work." 100 F.3d 1220, 1226 (6th Cir. 1996). *Ensley-Gaines* permits claims that an employer treated limitations on a pregnant employee's capabilities differently from limitations stemming from disabilities. For instance, in *Latowski*, the court held that a pregnant plaintiff with lifting limitations was similarly situated to coworkers whose limitations resulted from on-the-job injuries. 549 F. App'x at 482 & n.3; *cf. Tysinger*, 463 F.3d at 574–75 (6th Cir. 2006) (coworkers who did not request accommodations not comparable). While the Court is unaware of a precedent cabining *Ensley-Gaines* to accommodational differences, the analysis in the main text assumes it is so restricted. But even if *Ensley-Gaines* applies to Payne's termination, she would still fail to establish a prima facie case because she does not present evidence that other probationary employees who took sick days were hired permanently.

university's custodial department, did the same without incident. (Payne Dep. 86–87.) The absence of biased statements by the person who decided on Payne's continued employment, combined with the WMU custodial employees who were not fired for being pregnant, prove beyond dispute that Payne cannot establish the nexus element of her prima facie case.

      **2.    Nondiscriminatory Reason**

Even if it is assumed that Payne stated a prima facie case of pregnancy discrimination, WMU gave a strong, sex-neutral justification for Payne's firing: her unsatisfactory job performance. WMU presented extensive evidence that Payne was not properly performing the tasks assigned to her. Her first supervisor, Robin McPherson, had to reinstruct Payne on how to vacuum shortly after the technique had been demonstrated to her. (McPherson Dep. 45.) Another supervisor, Kayla Miller, had to remind Payne more than once how to properly maintain bathrooms. (Miller Dep. 35–36.) Snell described her as "miss[ing] a lot of stuff" and said she "didn't do a thorough job." (Snell Dep. 69.) This assessment of the quality of Payne's work was memorialized in the report from her first probation review, which noted that Payne "could improve on detail." (First Evaluation, PageID.270.) Payne herself testified that while she was working for Miller, she spoke with Miller about tasks being missed or needing to be redone on what "felt like every day." (Payne Dep. 61.) While Payne's performance was assessed as having improved at her sixty-day evaluation (Second Evaluation, PageID.280), Snell testified that she began receiving complaints about Payne again shortly afterwards (Snell Dep. 102). At Payne's final performance review, the uneven quality of her work was again noted (Final Evaluation), and her supervisor emphatically advocated that she be fired for not completing routine tasks like polishing water fountains and sweeping hallways (Snell Firing Email, PageID.309; Arnett Dep. 83).

If that were not enough, WMU gave evidence of a related shortcoming in Payne's work, namely her lack of interest or commitment. Snell testified that the major problem with Payne's

performance was her "work ethic." (Snell Dep. 102.) Miller testified that Payne did not seem interested in doing a good job (Miller Dep. 40) and did not internalize the guidance given by her supervisors (*id.* at 54). After Payne's firing, McPherson sent an email memorandum concerning another example of Payne's flippancy: when two senior custodians tried to explain to Payne how to maintain restrooms, Payne shrugged off the task as "easy" and did not pay attention to the specific tasks the senior custodians said she needed to accomplish. (McPherson Email, ECF No. 25-7.) The colleagues reported that Payne was more interested in her phone than their advice. (*Id.*) Both McPherson and Snell saw Payne on her phone when she should have been working. (McPherson Dep. 66–67; Miller Dep. 54; *see* Miller Email, ECF No. 25-8.) The episode with Arnett fits this mold; aside from Payne's defiance of workplace rules against sitting down outside of break hours (Snell Dep. 106), Arnett regarded Payne's statement that she had "nothing to do" as indicating a lack of commitment (Arnett Dep. 105), especially since Arnett previously told her to take care of routine upkeep after completing her specified assignments (*id.* at 83). At the extreme, this tendency of Payne's shaded into insubordination, which Snell reported occurred on at least one occasion when Payne "got smart" with a coworker who reproved her for completing a task incorrectly. (Snell Dep. 70; Miller Email.)

      Finally, WMU presented evidence that Payne was unreliable. This is distinct from the issue of Payne's attendance; the problem was less Payne's absence and more that she absented herself without informing others of her whereabouts. Snell heard from supervisors that Payne would disappear during work hours. (Snell Dep. 102.) Arnett reported to Schmidt that two custodians had gotten so fed up with this behavior that they asked not to work with Payne in the future. (Arnett Email; *see* Arnett Dep. 91, 104–5.) Payne's unsanctioned break shortly before her firing is another example of her tendency to disappear; at no point did Payne report to Arnett that

she needed to lay down because she felt unwell. (*See* Snell Dep. 102.) Taken together, Payne's inadequacies as a custodian more than adequately justified her termination.

### 3.    Pretext

Because WMU met its burden of presenting evidence that it fired Payne for poor performance, Payne can survive summary judgment only if she establishes a genuine dispute over whether this unobjectionable reason was mere pretext. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019). She can do so by showing that WMU's "reasons had no basis in fact," that those reasons "did not actually motivate" the university to fire her, or that they were "insufficient" to explain her firing. *Bashaw v. Majestic Care of Whitehall*, 130 F.4th 542, 548 (6th Cir. 2025) (quoting *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021)). Payne fails to demonstrate that any of these circumstances marred WMU's justification.

Payne does not attempt to show that WMU's characterization of her performance was wholly fabricated. She points to nothing that calls into question the testimony of her supervisors that her cleaning was substandard and her compliance with workplace rules sporadic. Concerns about her performance were recorded throughout her employment, starting with her first performance review (First Evaluation) up to the day before she was fired (Arnett Email). At most, Payne can point to some conflicting evidence on whether she had a bad attitude at the beginning of her employment: Snell did not record what McPherson told her about Payne being "smart" (*see* Snell Dep. 71) in Payne's first evaluation, which reported that Payne "accepts instructions" and "has a good attitude." (First Evaluation.) But Payne does not deny that she was "mouthy" (Miller Email) when working in McPherson's zone, and she provides no explanation for why the incident was not recorded in the evaluation report. That alone precludes treating the issue of Payne's attitude early in her employment as genuinely disputed. *See Gielda v. Bangor Twp. Schs.*, 505

13

F. App'x 550, 556 (6th Cir. 2012) ("A court should grant summary judgment in discrimination cases when the plaintiff only created a weak issue of fact as to whether the defendant's reason was untrue and there is ample evidence to support the employer's position." (cleaned up)); *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) ("The mere possibility of a factual dispute is not sufficient to create a triable case." (cleaned up)).  In addition, the materiality of any dispute over Payne's attitude fades into irrelevance in comparison to the extensive evidence, uncontested by Payne, that her work assignments were poorly or partially completed.  That evidence establishes that WMU's concerns about the quality of Payne's work were grounded in reality.

Neither can Payne show that the university was secretly indifferent to Payne's poor performance.  Payne contends she was fired because of Snell's annoyance at her pregnancy symptoms forcing her to attend doctors' visits and take breaks during the workday.  (*See* Pl.'s Resp. 20–21.)  Even so, Snell's criticisms of Payne's attendance do not imply that *the university* fired Payne for that reason and not her inability to complete work assignments as instructed.  Again, Snell's biases can be imputed to WMU only if it is genuinely disputable that she influenced Graham's decision.  Because the Court has concluded that Payne's attendance played no role in the decision to fire her, Payne cannot point to Snell's animus as the real reason for her termination.

Finally, Payne cannot establish that her shortcomings alone did not lead to her firing.  To do so, she would need to "present[] evidence that other employees, particularly outside the protected class, were not disciplined although they engaged in 'substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff.'" *McNeal v. City of Blue Ash*, 117 F.4th 887 (6th Cir. 2024) (quoting *Chattman v. Toho Tenax Am.*, 686 F.3d 339, 349 (6th Cir. 2012)).  The facts that would support that showing are essentially identical to those that would establish that a plaintiff's pregnancy and an adverse action were linked because similarly

situated, nonpregnant coworkers were treated better. *See Wolf v. Antonio Sofo & Son Importing Co.*, 919 F. Supp. 2d 916, 924 n.1 (N.D. Ohio 2012) (comparator evidence can be considered at either prima facie or pretext stage); *cf. Tysinger*, 463 F.3d at 573–74, 577 (relying on same comparators at both prima facie and pretext stages). As has already been established, however, Payne cannot point to any WMU custodial employee to whom she can properly be compared. Payne therefore fails to show that WMU treated her worse than employees with similar performance issues, blocking her last avenue to establishing that her firing was pretextual.

Payne's final argument is that her claim should be decided in accordance with *Twa v. Mercy Health Partners*, in which this Court found that a pregnancy-discrimination plaintiff who presented evidence that her employer fabricated a negative performance review survived summary judgment. No. 1:19-cv-1049, 2021 WL 3700753, at *5–6 (W.D. Mich. Aug. 20, 2021). But Payne, unlike the *Twa* plaintiff, can point to no evidence that her negative probation evaluations were made up. Payne signed all three reports (First Evaluation, Second Evaluation, Final Evaluation). And there is no evidence that Payne's supervisors, unlike Twa's, were "surprised to learn of her termination and had no indication it was coming." *Twa*, 2021 WL 3700753, at *6. To the contrary, Payne's supervisors uniformly testified that the departmental consensus favored her termination. *Twa* cannot salvage Payne's Title VII claim.

### B. Pregnant Workers Fairness Act Claim

In addition to alleging that WMU discriminated against her because she was pregnant, Payne accused WMU of violating the Pregnant Workers Fairness Act (PWFA), 28 U.S.C. §§ 2000gg to 2000gg-6, which bars employers from refusing to accommodate limitations accompanying an employee's pregnancy and childbirth. The PWFA's novelty means that the case

15

law interpreting it is scarce,[4] but courts that have entertained PWFA claims have treated them like failure-to-accommodate claims under the Americans with Disabilities Act. *See EEOC v. Sec. Assurance Mgmt., Inc.*, No. CV 25-00181, 2025 WL 2911781, at *4 n.4 (D.D.C. Oct. 14, 2025) ("Where the language of the PWFA mirrors that of the ADA or Title VII, the Court applies the legal standards governing ADA and Title VII claims to Plaintiff's corresponding PWFA claims, as the PWFA, ADA, and Title VII all share the same purpose: eliminating workplace discrimination."); *see also* H.R. Rep. No. 117-27, pt. 1, at 28 (2021) ("The PWFA uses the term 'reasonable accommodation,' as defined under the ADA, throughout the bill's text."). To survive summary judgment on a PWFA claim, a plaintiff must present evidence that "she is a qualified individual," her "employer was aware of her limitation," and her "employer failed to reasonably accommodate the limitation." *Keiper v. CNN Am., Inc.*, No. 24-cv-875, 2024 WL 5119353, at *2 (E.D. Wis. Dec. 16, 2024) (citing 42 U.S.C. § 2000gg-1(1)).

Payne's failure-to-accommodate claim fails at the second step because she presents no evidence that her employer was aware of any limitations on her job performance stemming from her pregnancy. According to Payne, the doctors' notes that she presented to her supervisors put WMU on notice that she was suffering from nausea and vomiting. (Pl.'s Resp. 29.) That may be so, but the only accommodation requested through those notes was that Payne be excused for missing work. The note that Payne gave to Snell in May, for example, requests that Payne be excused from work for the day of her doctor's visit and indicates that Payne had been "prescribed antinausea medication that should . . . allow her to work going forward." (*Id.*) Payne was granted the requested accommodation: her absence was excused, and it had no bearing on the decision to fire her at the end of her probation period. Nothing about the doctor's note suggests that Payne

---

[4] *See* Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084 (2022).

needed more extensive accommodations to deal with her pregnancy challenges, let alone that those challenges affected the quality of her work.

Payne also argues that the university failed to engage in the "interactive process" of crafting a reasonable accommodation by not volunteering to accommodate Payne at her sixty-day and her final probation evaluations. This argument too rests on the premise that Payne effectively communicated her need of an accommodation to WMU. But the undisputed evidence shows that Payne never informed her supervisors that her pregnancy was making it more difficult for her to fulfill her basic custodial duties. Payne admitted as much during her deposition. (Payne Dep. 85–86.) WMU cannot be faulted for not accommodating Payne's needs if she never made them known to the university. WMU is entitled to summary judgment on Payne's PWFA claim.

## IV.    CONCLUSION

Payne has not identified genuine factual disputes that would allow her to overcome Western Michigan University's summary judgment challenge. Her Title VII claim fails because she cannot point to evidence allowing the inference that her poor work performance was a mere pretext for her termination. And her PWFA claim fails because she did not present evidence that she ever made any limitations stemming from her pregnancy known to the university. The Court will therefore grant WMU's motion for summary judgment.[5] The same absence of evidence defeats Payne's cross-motion for summary judgment.

An order consistent with this Opinion shall issue.

Dated: November 13, 2025              /s/ Hala Y. Jarbou
                                       HALA Y. JARBOU
                                       CHIEF UNITED STATES DISTRICT JUDGE

---

[5] In light of this disposition, the Court declines to reach WMU's fallback argument that Payne did not mitigate her damages by securing a new job after her firing.